Good morning, Your Honor. My name is Steve Brown, and along with Patricia McCausland, we represent the appellant in this case. Mr. Brown, at the outset, in case I forget it at the end, your office, the Deckard office, also has volunteered your services as pro bono counsel in this case. And once again, we thank you and your firm. We appreciate the thanks, and we'll take that back to the firm. In fact, myself and one of Mr. Suplee's partners, Sam Silver, were co-coordinators of the Prisoner's Civil Rights Panel here in the Eastern District, and we're happy to serve in that capacity. That's great. Thank you. As I said, my name is Steve Brown, and along with Patricia McCausland, we represent the appellant in this case, Stephen Corey Morrison, and I'd request permission to reserve two times, two minutes for a rebuttal. Yeah, not two times, Steve. Yes. Okay. No harm in asking, Your Honor. You don't have to do the multiplication, Deputy. The issue in this case is whether there was a genuine issue of material fact with respect to whether there was probable cause to arrest Mr. Morrison on December 9th of 2002, when the affidavit submitted by Officer Schultz, a police officer in the Reading Police Department, contained affirmative misstatements of fact. Okay. Help me right there. Sure. What is the significance of the affidavit? I mean, he was arrested. Let me put it this way. Isn't the issue whether there was probable cause at the time he was arrested, and wasn't he arrested before an affidavit was ever produced or warrant issued? I don't believe he was arrested. I think he wasn't charged with any crime. He was arrested when he was charged with the crime of possession of an office of firing. He wasn't arrested when they took him from his house to the station? They didn't take him from his house, Your Honor. Well, from the house. Right. I think he was arrested when he was charged with a crime. And I don't think it makes any difference, Your Honor, because the facts that were known to the officer, Officer Schultz, were the same, whether he arrested him at the time or whether those facts were presented to a judicial officer to make an independent determination of whether there was probable cause to commit the crime. It doesn't make a difference to the analysis, though. I mean, if he was arrested without a warrant, whether he made misrepresentations or misleading omissions seems to me wholly irrelevant to the analysis. Well, at the end of the day, I think the misleading omissions only make a difference when evaluating his state of mind at the time, because if we go through the analysis... His being Schultz? Yes, sir. If we go through the analysis that Judge Becker so eloquently presented in the Wilson v. Russo case, what we're going to end up doing is taking those affirmative misrepresentations out of the affidavit, then inserting into the affidavit those material facts which a judge or a judicial officer making a finding of probable cause would want to know, and then making a determination of whether there was probable cause based upon those facts, or all of the facts, that were accurate and a judicial officer would have known at the time. All right. Well, let me... It would be helpful to me at the outset to make sure I realize what database we're working with here when we ask about probable cause at either points in time, and qualified immunity. There are some circuits that have, as pointed out in the briefing, combined knowledge doctrine they've adopted, which means that in determining whether there's probable cause, you look to the combined knowledge of all of the officers working on the matter, and not solely on the knowledge of the arresting officer. Yes, sir. Now, this generally comes up when the arresting officer didn't know some inculpatory information that was necessary to make the case for probable cause, but somebody else did. Working on the investigation. Working on the investigation. Offensively. Yes, sir. Okay. Well, now here we have a situation where Schultz had knowledge of Schwanbach's ID, but others knew that her original description arguably was inconsistent with her ID, and also that she had ID'd him as the passenger, while Schultz had thought he was the driver. Correct. Now, is Schultz chargeable with any exculpatory knowledge that others possessed in this investigation? Yes, both under the O'Connor case that was decided by this circuit just recently, and then second... Help me with that, O'Connor. I couldn't find a case on exculpatory. I think it was cited in our reply brief, Your Honor, and... Oh, you mean in terms of whether they're charged with exculpatory as opposed to inculpatory? Yes. That, Your Honor, there was not a case in the Third Circuit, but I could... O'Connor is not a published, is not a precedential opinion. Correct, Your Honor. And we, yeah, I mean, I think it's important that people understand that non-precedential means exactly that. This Court has, however, invoked the collective knowledge doctrine previously. Yes, it has, Your Honor. In a precedential opinion, but not in the manner in which you see it. Well, help me with that. What precedential opinion has it, have we adopted the, or applied the combined knowledge doctrine? I'd have to ask you something... It's U.S. versus Bell. We avert to it in a footnote. And our position, Your Honor, would be that it has to work both ways, that if the government... But we invoked it to work the other way. I understand. Correct, yes. Correct. Well, now, wait a minute, before we leave that, one more question. Sure. I'll let you go on. How about when you're doing qualified immunity analysis, and when you ask whether the officer, a reasonable person in the officer's position would have realized that this was contrary to well-established law. Does the combined knowledge there apply, doctrine there apply as well? That is, is the officer charged with exculpatory knowledge that he didn't have, but somebody else had? In other words, if somebody, I see, I have a witness that IDs the suspect, it's a little suggestive. In the meantime, somebody has confessed at the station to the crime, but I have no knowledge about it.  Okay, am I chargeable, is the arresting officer chargeable with knowledge that somebody else has confessed to this crime for purposes of qualified immunity? I would say yes, but on the facts of our case, I don't think we even have to get there, because the key knowledge here is what Officer Shultz knew. He was the person who made out the affidavit. And the key conflicts between his knowledge and the ID of the witness are basically either what he knew, and he knew from his own personal knowledge, and this is what distinguishes our set of facts versus Wilson versus Rousseau or any of the other cases. We're talking not about an officer faced with a challenging situation where he has to decide between two witnesses, who is and who is not telling the truth, who to credit, who not to credit. Officer Shultz, of his own personal knowledge, knew the passenger of the car was short, almost kid-like in his own knowledge, and had a big, bushy afro. That's what he described. And in this case, it's significant who was the passenger, because the passenger was the person who had possession of the gun. That's who the police had to identify. So that's his information. Second of all, Sergeant Fiz, he was the officer, or he was the sergeant, who brought the witness over. The witness testified at A313 of the appendix that she told Officer Fiz, or Sergeant Fiz, excuse me, at the show-up, I identified Mr. Morrison, he was the passenger of the car. Sergeant Fiz then spoke to Officer Shultz to say, Schwambach has ID'd Mr. Morrison. It is at least a question of fact of whether our position is, Officer Fiz obviously told Officer Shultz that the eyewitness said he was the passenger. So that then directly conflicts with the identification of the officer driving up right behind the car. He's a trained officer. They're trained to observe details. That's part of what they do for a living. All the officers conceded that in their depositions. And he knows Morrison is 5'10", 5'11". He's 27 years old. He's an adult. And he has close-cropped hair. So based upon his own personal knowledge, he had information which almost is like the identification that Judge Becker said would undermine an eyewitness identification in the Wilson v. Russo case. Judge Becker, the Wilson v. Russo is obviously important in this case for so many reasons. Eyewitness ID isn't enough. We look beyond the eyewitness ID. And Judge Becker gave several examples of the types of information that in and of themselves could undermine an eyewitness ID and render it not sufficient to prove probable cause. Number one was he said, oh, if the witness identifies the person as, and I forget what you said, the witness said 5'12". And, in fact, the alleged suspect is 7'12". We would say, Your Honor, that is equivalent to having close-cropped hair and a big bushy afro. It would be equivalent to somebody saying, oh, that person looked just like Steve Brown, who doesn't have much hair, except he had a big bushy afro. Well, that's obviously not Steve Brown. Second of all, what the judge said, Judge Becker said, the second example he gave was DNA. The third example he gave was if another witness said that the suspect is not the person, not the person, and that's exactly what Officer Gresh said in this case. Officer Gresh, Moritz, and Officer Schultz said he believed he followed Moritz and then Moritz jumped in a van and he lost sight of him. Officer Gresh said, Mr. Moritz's testimony at his deposition was, Officer Gresh said to all of the officers, Moritz is not the man who jumped out of the van. Therefore, he could not be the driver. So that was said in 1719 Laurel Street in the presence of all the officers. That's also, Mr. Morrison testified, that that's when Sergeant Fizz got angry at the police officers and said, I want someone. I want someone identified. And going back to what was happening at 1719 Laurel Street, because this goes into what Schultz knew, Your Honor, Schultz went into the house and lo and behold, what did they find? They found a 5'5 young man, 17, Mr. Andrew Bing, with a big black afro, hiding in a bed with a rifle point in bed with him. With Morrison, too, there, right? Morrison was in the house, yes, Your Honor. So there's certainly some suggestion of interaction between possible Morrison and Bing. Absolutely, Your Honor. That's why Gresh is saying he's not the guy is so significant, Your Honor, and why Schultz's own knowledge that he was not the passenger, because what the officers did is they believed Bing was the person whom they were going to get to show them, because Schultz couldn't identify Bing. Nobody could identify Bing. They found him in bed with the gun, with shotgun shells on either side of his bed. He's the one they choose to handcuff. They handcuff Bing. They take him downstairs with another young man who was Hispanic, and Mr. Morrison. The one in the multicolor jacket. Yes, Your Honor, who they take outside. And lo and behold, the witness IDs Mr. Morrison and not Mr. Bing, the man who ended up confessing to the crime months later. So in this situation, you've got personal knowledge by Schultz that the passenger, the person who allegedly committed the crime at the time who had possession of the gun, was physically different. And it's not just like the Wilson case where the only difference was the height. The three differences, height, hair, and not just that it wasn't a hair color, it's a significant difference between an afro and closely cropped hair, and a position in the vehicle, which was significant. Thank you. You're welcome, Your Honor. We'll get you back for your two minutes. Not two times two. Ms. Fulton. Thank you, Your Honor. May it please the court, my name is Janelle Fulton. I represent the city of Reading and Officer Scott Schultz. With me at council table is David McMain, who is also on the brief. Could you help me just at the beginning? He was arrested before the affidavit was filed? Yes, he was, Your Honor. All right. Combined knowledge doctrine, do you acknowledge that we have that in the Third Circuit and that it is applicable to inculpatory information as well as exculpatory information when one is trying to decide whether probable cause existed at the relevant time? I do not believe that this court can import knowledge that Officer Schultz did not have when he prepared the affidavit of probable cause. Wait a minute. In Bell, didn't we? It's in the next court. In Bell, inculpatory. Inculpatory, yes, Your Honor. Okay, yeah. Back to Judge Stabenow's question. You do agree that since we're at a summary judgment stage, if there is some evidence, competent evidence, that Schultz knew something, we have to assume that he knew it for probable cause purposes, even if he denies it, right? Yes, Your Honor. For summary judgment. Yes, at this stage, yes. But it's our position that the court doesn't even have to get to that question because the court should affirm the district court's grant of summary judgment because this, not only the district court, but two other judges, the district justice and a judge sitting on the Court of Common Pleas of Berks County, both looked at the evidence that Officer Schultz had and determined that based on the evidence presented to him at the time, he had probable cause to arrest Mr. Morrison. So it's our position that the inquiry... But didn't they decide that on the basis of the affidavit? The district justice looked at the affidavit, but then in addition... But if the affidavit was misleading or improper for some reason because it had wrong information and didn't have other information, what is the effect that a district justice acting on that basis found probable cause? Because even assuming for sake of this argument that you should correct the affidavit to remove the evidence that they say was put in in error and you add the exculpatory evidence that they say should be imported to Officer Schultz, it doesn't undermine the reliable eyewitness identification that provides... But that's not... My question went to the point that you made. You made the point that we have an independent determination by a district justice, and the only comment I made was, well, that, quote, which they argue was misleading. So to what extent do we credit the fact that there was a district justice determination? That was my question, and I'm not sure that you responded to that. Don't we have to evaluate what was before him or her? Yes, that's correct. And in doing so, I think the best way to address it is, as the courts dictated in Wilson, is to correct an affidavit because not only the evidence in the affidavit that they say should not have been included or should have been included, there's also the eyewitness identification, which by itself provides substantial and significant and sufficient probable cause for the arrest, even if... I understand, though, that Mr. Brown was telling us that they shouldn't have credited Ms. Schwambach's identification in light of what they knew at the time, what Schultz knew at the time. Is that what Mr. Brown was saying? I think that is what Mr. Brown was saying, and we disagree. And we disagree because it's our position that the identification was reliable and that Officer Schultz was entitled to rely on her identification at the time. It was made within 45 minutes of the incident. If you examine it under the five factors set out in both Neal v. Biggers and United States v. Brownlee, just going through the five, the first question is the witness's original opportunity to observe the suspect. There's no question in this case that Ms. Schwambach had an opportunity to witness and observe the two men for at least 10 minutes at close proximity, and she even engaged in a conversation with one of the men who she later identified as Morrison. The next factor is... I don't understand something in this case. What was the resource center from which she observed? I mean, it wasn't her house. It just says in the brief it was a resource center. Do you know what that is? Yes, Your Honor. I believe she testified at her deposition that it's a building. I'm not sure whether she resided there or not, but it was, I think, a home that had a large picture window and she could see the men outside. I understand that. I just didn't know. She's a community activist. Well, I understand that also, and that may add to the police's willingness to accept her, and maybe she's not the neighborhood busybody that the appellants characterize her as in their brief. But, you know, I just don't know. Does she stand at that window a lot? I don't know what it is. It's my understanding, and I think it's also the understanding of the Reading police officers, that she does keep an eye on her neighborhood. Like a neighborhood watch person. Yes, she was very active. She testified in her deposition that she is active in her neighborhood watch. And so I think it's part of it she takes upon herself to observe. To look out the window. Yes, observe what's going on in her neighborhood to protect herself and her neighbors. Good. Which is one of the reasons the officers were able to rely upon her, because they had a lot of experience with her in the past. She's called the Reading Police Department on numerous occasions. Mr. Schultz personally had experience with her. Officer Schultz. I don't believe he was asked at his deposition whether he has, so that would not be in the record. Somebody testified about prior experience with her. Yes, Sergeant Fizz testified. And Sergeant Fizz is the police officer, and he's Officer Schultz's supervisor, and he's the one who transported Ms. Schwambach to the scene where she identified. The show-up, which is not a line-up. Correct. It's a different kind of procedure. It is. And in a sense, technically it is still a show-up, but it's not a show-up in the sense that there was a show-up in some of the other cases, like Brownlee, where there was just one person, or also McGrath. You're saying it's not suggestive. It's not as suggestive as a show-up. Show-ups are inherently suggestive, aren't they? The court has said that show-ups are inherently suggestive, but in cases where the court has said that, it's a show-up where there is one person. They're handcuffed in or near a police cruiser with lots of police officers around. That was not the case here. Mr. Martin testified. You're not saying this was not suggestive when they had three people and two were juveniles and one was 26 or 28 years old and he was the guy. Oh, and one of the juveniles was Hispanic, right? Well, I'll try to address a few of those. I'm going to separate them out into a few questions. You think it was not suggestive at all? I'm not saying that it wasn't suggestive at all, and I think that's why we reached the evaluation that the district court did under Biggers and Brownlee to determine whether or not it was, nevertheless, whether it was suggestive. Was it a reliable eyewitness identification? Why didn't you tell us why you think everything else notwithstanding, Redding is entitled or Schultz is entitled to qualified immunity? Thank you, Your Honor. You're welcome. I think he's entitled to qualified immunity because this issue has been addressed at least three times over the last five years. And at the criminal case, in the criminal case, Mr. Morrison moved to suppress the identification of Ms. Schwambach. He was represented by counsel. Ms. Schwambach testified. The other officers involved, including Sergeant Fizz and Officer Schultz, testified. His attorney had an opportunity to cross-examine them, and the judge made a determination that her eyewitness identification was reliable. If a court of common pleas judge believes, based on the information that Officer Schultz had, that the identification was reliable, how could Officer Schultz not know that it was reliable? And then again, it was raised before. That's interesting. Go ahead. I'm sorry, Your Honor. And then it was raised again before, in the civil matter, before Magistrate Judge Rice, who not only has experience as a sitting magistrate judge, but many years of experience as a United States attorney, and he looked at the facts that were available to Officer Schultz, in the light most favorable to Mr. Morrison, and determined, based on those facts, that he had probable cause to arrest. In fact, didn't the district court here conclude that the Schultz affidavit provided probable cause, even if it was corrected to remove any of the misleading and erroneous statements, and to include any material omissions? That's correct. And we obviously agree with the district court's finding, because even if you take out the information regarding, which we think is ambiguous, whether he says the suspect and whether Officer Gresh and the driver of the van identified Morrison as the suspect, even if you take that out and you add in the information that they claim is exculpatory, which I don't agree is exculpatory, but the fact that it was different clothing, different heights, both Ms. Schwanbach and Officer Schultz identified one of the men, the driver, as being 5'10 to 6 feet tall and weighing approximately 175 pounds. Mr. Morrison testified that at the time he was 5'10 and weighed 160 pounds. He now weighs 175 pounds. They identified the other man. They feed him well and during the eight months in prison. They identified the other man as much shorter, and that description was consistent with Mr. Bing, who ended up coming forward six months later. It's also, I'm sure, no coincidence that Mr. Mr. Morrison's now wife suggested to him that probably that he couldn't be, he wouldn't be likely to get, I guess you couldn't get a felon in possession of a weapon. He wasn't a felon, he was a juvenile. You took the words out of my mouth. This was an epiphany. Yeah. And Mr. Bing was already in juvenile detention at the time that he decided to make this confession out of the goodness of his heart. After the suggestion by his, quote, auntie. Correct. We do read the record. In addition, I want to get back to qualified immunity because I think that's an important issue in this case. So you're telling us that we should hold that the defendants are protected by qualified immunity because the district court and another judge found that there was, thought that there was probable cause to issue the warrant. Yes. My argument is that if. We don't have an independent responsibility to look at that. What is it? Is that a de novo determination by us? Yes, it is, Your Honor. So we do have an independent responsibility to see whether qualified immunity applies. Yes, you do, Your Honor. But the point I was trying to make was that. The same facts that cause them to say it should also cause us also hold. Yes, my point was that if two well-trained, not just lawyers, but judges, looking at the same facts, believe that probable cause existed, it cannot be said that a reasonable officer in Officer Schultz's position would not also believe that it was lawful for him to arrest and that he had probable cause to arrest Mr. Morrison. I'm sorry, was there a question? I don't have a question. Okay. And I also wanted to address the. . . Well, I'm sorry. You started off to tell us the various reasons the officers had to believe, had reason to believe that the I.D. was reliable. Yes. And you started talking about the witness having had a good opportunity to observe. Yes. But you didn't finish that thought. Thank you for reminding me. The opportunity to observe. . . He's reminding me that I interrupted him. They knew that she had an opportunity to observe them because she called the police department several times and she gave a description of the car the men were in. As Officer Schultz pulled up, he saw the men in the car that she described, the green car. Wait a minute. Didn't she also actually go outside and speak to the person? Yes, she did. They weren't there actually. She initially viewed him, and then there was a second encounter. Yes. She spoke with. . . She had a verbal exchange with the man she later identified as Mr. Morrison. And she identified him not just at the scene that day, but she also identified him positively again and without hesitation and unequivocally at the hearing to suppress her eyewitness identification. Your red light is on, but do provide the other three reasons because Judge Stapleton is going to make sure that you get your five reasons in. Thank you, Your Honor. The other reasons are the degree of attention that the witness paid to the suspect. Again, she had an opportunity to observe them. She called in several times, so it was clear that she had paid attention. You based this all on Ms. Schwambach? Yes. Okay. Yes. And also the accuracy of the initial description. Again, as I mentioned earlier, she described both of the men in the same description that Officer Schultz gave them. The question is whether at one point was one in the passenger seat and one in the driver's seat. When they got out of the car and she had her encounter, did they get back in the car in different positions? So I don't think Mr. Morrison can hang his hat on whether one was the driver and one was the passenger at the time because the question is at which point was he the driver and the passenger. So I don't think that's a material issue. And the fourth question is the witness's degree of certainty when viewing the suspect at the confrontation. She identified him immediately without hesitation, without any prompting from the officers, and the elapsed time, the identification was within 45 minutes of the encounter. Thank you very much.  Mr. Brown? Thank you, Your Honor. Two minutes times one. Thank you. I want to talk about that. Oh, yeah. You didn't really talk about the qualified immunity defense. Yes, Your Honor. I think we'd like to hear, I think I would like to hear you on that. Fine. The qualified immunity is designed to protect officers who are behaving reasonably if there's some uncertainty in the law. Here in this case, I believe in this case the officer was either plainly incompetent or made deliberate misstatements. He was plainly incompetent because there's absolutely no evidence that Gresh ever identified Mr. Morrison as the person who got out of the van. As a matter of fact, Gresh's testimony, his own testimony, is that Morrison looked different than that man because he had a lighter complexion. So that is just wrong. Second of all, the statement in the affidavit, and to the extent that this was in his head, it's plainly wrong, it's plainly incompetent, because Figueroa was never, ever asked to identify the person who was in the vehicle. So that whether it's in the affidavit, Judge Stapleton, or it's in his, presumably it was in his head, or he felt the need to deliberately misrepresent it, there was no basis for it at all. Second of all, with respect to the other facts that he had personal knowledge of himself, with respect to the passenger in the vehicle having a different hairdo, if that's what you want to call it, being different size in stature, being consistent with being whom they found in the house, those are all covered in Wilson v. Russo in year 2000 as factors that he should have considered. And Wilson v. Russo also made the point that you just can't rely upon the ID, the eyewitness ID. And significantly here, in terms of assessing the reliability of the ID, it is significant that there is a real issue of whether Ms. Schwanbach had provided any identification to the police other than two black males. Thank you. Okay. Thank you, Your Honor. Thank you very much, and you'll send my thanks back to the firm. Thank you, Your Honor. Okay. Our thanks. We will take the matter under advisement.